ELECTRONICALLY FILED
COURT OF COMMON PLEAS
Tuesday, January 12, 2021 1:09:32 PM
CASE NUMBER: 2021 CV 00134 Docket ID: 35158861
MIKE FOLEY
CLERK OF COURTS MONTGOMERY COUNTY OHIO

IN COMMON PLEAS COURT OF MONTGOMERY
COUNTY, OHIO CIVIL
DIVISION

| | | |
|---|---|---|
| **JOSEPH BELLOMY,** for himself and those similarly situated<br>1588 Ken Klare Drive<br>Beavercreek, Ohio 45432 | : : : : : | Case No. _____ |
| Plaintiff, | : : | |
| vs. | : : | **CLASS ACTION COMPLAINT WITH JURY DEMAND** |
| **PREMIERE HEALTH PARTNERS**<br>110 North Main Street<br>Dayton, Ohio 45402 | : : : : | |
| and | : : : : | |
| **PHYSICIANS & SURGEONS AMBULANCE SERVICE INC.**<br>**dba American Medical Response,**<br>**American Medical Response of Ohio,**<br>**AMR, and AMR of Ohio**<br>c/o CORPORATION SERVICE COMPANY, Registered Agent<br>50 West Broad Street, Suite 1330<br>Columbus, Ohio 43215 | : : : : : : : : : | |
| Defendants. | : : | |

Plaintiff Joseph Bellomy ("Bellomy"), on behalf of himself and putative Class Members,

files this Class Action Complaint against Defendants Premier Health Partners, American Medical

Response, Inc. and Physicians & Surgeons Ambulance Service, Inc. dba American Medical

Response of Southern Ohio state as follows:

## I.     INTRODUCTION AND PARTIES

1.      Bellomy is an Ohio citizen who resides at 1588 Ken Klare Drive, Beavercreek,

Ohio 45432. During all relevant time periods, Bellomy was a "consumer" within the meaning of

Ohio Revised Code § 1345.01(D) and a "person" within the meaning of Ohio Revised Code § 2923.31(G).

2.      Defendant Premier Health Partners ("Premier") is registered as an Ohio nonprofit corporation and headquartered at 110 N. Main St., Dayton, Ohio 45402. Premier owns and operates a network of hospitals and health centers throughout the Dayton, Ohio area, including but not limited to Miami Valley Hospital ("MVH") in Dayton, Ohio and Miami Valley Hospital South "MVHS") in Centerville, Ohio. During all relevant times, Premier was a "supplier" within the meaning of Ohio Revised Code § 1345.01(C) and a "person" within the meaning of Ohio Revised Code § 2923.31(G).

3.      Defendant Physicians & Surgeons Ambulance Service, Inc. dba American Medical Response, American Medical Response of Ohio, AMR, and AMR of Ohio (collectively, "AMR") is an Ohio corporation with its principal place of business in Akron, Ohio.  Upon information and belief, this entity is an affiliate and/or subsidiary of American Medical Response Ambulance Service, Inc.  According to its website, AMR, which is part of the Global Medical Response network of companies, has 38,000 employees, and "deliver[s] compassionate, quality medical care, primarily in the areas of emergency and patient relocation services around the world. We provide end-to-end medical transportation as well as fire services, integrated healthcare solutions and disaster response."

4.      Individual Plaintiff, on behalf of himself and all others similarly situated putative Class Members, brings individual and class claims seeking to recover actual, statutory, treble, and punitive damages, injunctive relief, and their attorney's fees and costs based on Defendants' unlawful billing practices and procedures utilized against Individual Plaintiff and putative Class Members in knowing and willful violation of the Ohio Consumer Sales Practices Act

("OCSPA"), Code § 1345 et seq. the Ohio Corrupt Practices Act ("OCPA"), Ohio Revised Code § 2923.31 et seq., and Ohio common law.

## II.     JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over these claims pursuant to Ohio Revised Code § 2305.01 (common law claims), Ohio Revised Code § 1345.04 (OCSPA claims) and Ohio Revised Code § 2923.34 (OCPA claims).

6.     Venue is proper in Montgomery County, Ohio pursuant to Ohio R. Civ. P. 3(B) because the parties reside in Montgomery County, Ohio, regularly conduct business in Montgomery County, Ohio, and a substantial part of the events giving rise to the claims of Plaintiffs and putative Class Members occurred in Montgomery County, Ohio.

7.     Defendants engaged in business, engaged in tortious acts or omissions, and have otherwise made or established contacts within Montgomery County, Ohio sufficient to permit the exercise of personal jurisdiction.

## III.     FACTUAL ALLEGATIONS

### A.  Surprise Medical Billing

8.     A surprise medical bill is one that a patient receives when they have gone to a medical facility within their insurance network, only to unknowingly and unexpectedly be treated by providers who are out of their insurance network. This practice often results in unexpected — and significantly high — bills which can create considerable financial burdens for patients.

9.     Surprise billing is especially common in emergency rooms, where patients must act quickly under stress. A provider that contracts with an in-network hospital behaves egregiously when it does not disclose its independent status and the fact that the contracted group does not take the same insurance as the hospital, and when it does not make information about what insurance

is accepted reasonably available. The problem is compounded when the group then sends surprise bills for charges in excess of the fair market value of the services provided.

10.     Many insurance companies will not cover their policyholders for bills they have incurred by out-of-network providers, even if the patient had no knowledge concerning whether the provider was in or out of network.

11.     Studies show that one out of every five trips to the emergency room results in a patient receiving a surprise medical bill. It is estimated that almost two-thirds of bankruptcies are related to medical debt.[1]

12.     In an article written in the *Health Affairs[2]*, it was estimated that 71% of all ambulance rides involved potential surprise bills. For both ground and air ambulances, out-of-network charges were substantially greater than in-network prices, resulting in median potential surprise bills of $450 for ground transportation. Out-of-network ground ambulance balance bills totaled approximately $129 million per year.

13.     After years of debate, and in an effort to curb this practice, Congress recently banned surprise medical bills as part of its $900 billion stimulus package passed on Dec. 21, 2020 that provides aid to those suffering the adverse economic effects of the coronavirus pandemic. However, excluded from that ban are ground ambulance services.

**B.  The 2017 Medical Transport Bill**

14.     On July 20, 2017, Mr. Bellomy fell ill, and was seen in the Emergency Room of Miami Valley Hospital's South Campus ("South Campus"), a Premier facility that is contracted as a network provider with Anthem Blue Cross Blue Shield, which was Mr. Bellomy's insurance provider.

---

[1] https://www.thebalance.com/medical-bankruptcy-statistics-4154729
[2] https://www.healthaffairs.org/doi/10.1377/hlthaff.2019.01484

15.     Mr. Bellomy went to South Campus because (i) it was near Mr. Bellomy's residence, and (ii) it accepted Mr. Bellomy's insurance, and (iii) it was an in-network provider for Anthem.

16.     Upon arrival, Mr. Bellomy provided the hospital staff with his insurance card, and South Campus staff did in fact represent to Mr. Bellomy that (i) Premiere accepted Mr. Bellomy's insurance, and (ii) Premiere was an in-network provider for Anthem.

17.     While at South Campus, Mr. Bellomy was advised that additional testing was required, and that he would need to be transported to Miami Valley Hospital's Main Campus downtown for such testing.

18.     Mr. Bellomy asked whether he could drive himself or be driven by his wife to the Main Campus since it was less than a 20-minute drive but was advised that he would need medical transport for continued observation by a medical professional.

19.     In fact, were Mr. Bellomy to refuse transport, he would be acting against medical advice, which could impact his insurance coverage under Anthem's schedule of benefits.

20.     An AMR transport ambulance took Mr. Bellomy to the Main Campus. Once there, he was admitted for testing and treatment as there was no neurologist on staff at Miami Valley South. He remained at the hospital for several days.

21.     At no time were Mr. Mr. Bellomy or his wife given a choice as to which transport service could be used. Premiere simply contacted AMR for the transport to MVH, and the Bellomys were told by hospital representatives that a transport had been arranged.

22.     Further and most significantly, neither Premiere nor AMR disclosed to Mr. Bellomy or his wife that that AMR (i) was an independent contractor, (ii) was not "in-network"

with Anthem, (iii) engaged in "balance billing" practices, or (iv) charged rates well in excess of those rates which any similarly situated transport company would charge for the same services.

23.    Premiere and AMR concealed and refused to disclose any billing or costs associated with AMR's transport services.

24.    These foregoing facts were material to making an informed decision regarding treatment. Had Premiere or AMR disclosed these facts to Mr. Bellomy or his wife, Mr. Bellomy would have requested an in-network transport company.  However, upon information and belief, Premier and its hospitals have not contracted with any transport company in the greater Dayton that is "in network" with Anthem.

25.    Weeks after his hospital visit, Mr. Bellomy received a "balance bill" from AMR, at which point first learned that AMR was not an in-network provider for Anthem.

26.    In total, Mr. Bellomy's transport bills to MVH were $1,435.89. Of that amount, Anthem agreed to pay $314.39, which represents the amount that Anthem would have paid an in-network provider for the same services, leaving the Bellomys with the remainder. Upon information and belief, the bill from AMR is well in excess of what a similarly situated transport company in the Dayton, Ohio area would charge for the same services. Upon information and belief, as part of its normal business practices, AMR routinely inflates its prices for such services, knowing that Anthem, which is one of Ohio's largest health insurers, would only cover a fraction of the bill, leaving the consumer with the remaining balance.

27.    AMR then sent the 2017 invoice to Credence Resource Management, a collection agency.

28.    Defendants have continued or allowed to continue these unlawful practices despite repeated complaints from patients over the course of many years.

**B.     The 2019 Medical Transport Bill**

29.     Less than a year and a half later, it was deja-vu all over again.  On January 27, 2019, Mr. Bellomy fell ill, and again was seen in the Emergency Room of Miami Valley Hospital's South Campus.

30.     Upon arrival, Mr. Bellomy provided the hospital staff with his insurance card, and South Campus staff again represented to Mr. Bellomy that (i) Premiere accepted Mr. Bellomy's insurance, and (ii) Premiere was an in-network provider for Anthem.

31.     While at South Campus, Mr. Bellomy was advised that he needed an MRI, but that the hospital did not have an anesthesiologist on duty, and therefore he would need to be transported to Miami Valley Hospital's Main Campus downtown for such testing.

32.     Fearing another surprise bill, Mr. Bellomy asked whether he could drive himself or be driven by his wife to the Main Campus since it was less than a 20-minute drive but was advised that he would need medical transport for continued observation by a medical professional.

33.     Again, were Mr. Bellomy to refuse transport, he would be acting against medical advice, which could impact his insurance coverage under Anthem's schedule of benefits.

34.     Mr. Bellomy and his wife then asked if they could contact a transport service that is in-network with Anthem.  However, Premier advised that the only transport contract that it had was with AMR, and as such an AMR transport was the only alternative.

35.     Left with the Hobson's Choice of either paying a balance bill for out-of-network transport services by AMR or potentially receiving treatment that would not be covered by Anthem because he acted against medical advice by driving himself to the Main Campus, Bellomy opted for the former.

36.     As such, an AMR transport ambulance took Mr. Bellomy to the Main Campus. Once there, hospital staff performed an MRI, and Mr. Bellomy remained at the hospital for a period thereafter.

37.     After his hospital visit, Mr. Bellomy received a bill from AMR for $1,553.50,

38.     In total, Mr. Bellomy's transport bills to MVH were $1,553.50. Again, Anthem agreed to pay the amount that Anthem would have paid an in-network provider for the same services, which was $314.49. Upon information and belief, the bill from AMR is well in excess of what a similarly situated transport company in the Dayton, Ohio area would charge for the same services. Upon information and belief, as part of its normal business practices, AMR routinely inflates its prices for such services, knowing that Anthem, which is one of Ohio's largest health insurers, would only cover a fraction of the bill, leaving the consumer with the reminder.

39.     AMR then sent the 2019 invoice to Credence Resource Management, a collection agency.

40.     Defendants have continued or allowed to continue these unlawful practices despite repeated complaints from patients over the course of many years.

**C. Premier's Contract With AMR**

41.     Upon information and belief, Premier and AMR entered into a contract whereby AMR agreed to provide medical transport services to patients at Premier's hospitals. Upon information and belief, as material terms of this contract, AMR had duties to perform medical transport services to Premier's patients and to disclose to patients its status as an independent contractor and its billing practices, including a duty to disclose whether AMR accepted insurance, was an "in-network" provider, and engaged in "balance billing" practices. AMR also

had a duty to charge patients reasonable rates to patients for performing its transport services and to work with patients to reasonably resolve billing issues.

42.     Defendants knowingly and willfully entered into a scheme which allowed and continued to allow AMR to perpetrate its billing scheme and practices on Individual Plaintiff and putative Class Members. This scheme was financially beneficial to both Defendants because it allowed Defendants to generate increased medical fees which otherwise would have been jeopardized or lost had Defendants provided prior disclosure that AMR (i) was an independent contractor, (ii) was not "in-network", (iii) engaged in "balance billing" practices, and (iv) charged rates well in excess of those rates any similarly situated transport company would charge for the same services. As illustrated by the experiences of Individual Plaintiff, Defendants knowingly and willfully fail to make these foregoing disclosures regarding AMR's status and billing practices, even after Individual Plaintiff and putative Class Members were screened and stabilized.

43.     Upon information and belief, AMR and Premier do not disclose to patients the following material facts: (i) AMR is an independent contractor, (ii) AMR is not an "in-network" provider for Anthem, (v) AMR engages in "balance billing" practices, (vi) and AMR bills at rates substantially higher than what any similar situated company would charge for services. Patients are not informed of these material facts until after receiving services and when AMR sends a balance bill, which is often weeks after it has performed medical services. As a result, patients are unable to make an informed decision regarding their medical treatment, such as requesting a different in-network transport company.

44.     Upon information and belief, AMR does not disclose any information to patients relating to its out-of-network status at Premier.

9

45. Upon information and belief, AMR knew it had captive patients and it preyed upon these vulnerable patients because it sought to benefit financially by not disclosing any information to patients.

46. This unlawful conduct resulted in substantial direct and proximate damages to Individual Plaintiff and putative Class Members through no fault of their own.

47. Upon information and belief, both Premier and AMR have received numerous complaints and grievances from patients over the course of years regarding their illegal and unethical conduct. Nonetheless, Defendants have knowingly and willfully continued the foregoing scheme because both Defendants gain financially by continuing to generate increased medical fees.

48. Defendants engaged in fraudulent and negligent conduct as part of a civil conspiracy to exploit the relationship that Defendants had with Individual Plaintiff and putative Class Members. This unlawful conduct resulted in substantial direct and proximate damages to Individual Plaintiff and putative Class Members. Individual Plaintiff and putative Class Members seek redress for Defendants' unlawful and unethical conduct.

IV.    **CLASS ALLEGATIONS**

49. Individual Plaintiff brings this Class Action on behalf of himself and on behalf of a class of persons who were subject to Defendants' repeated and systematic violations of Ohio statutory and common law. Individual Plaintiff seeks injunctive relief and damages, on behalf of himself and all others similarly situated, arising out of and relating to the conduct of Defendants (including all of their affiliates, subsidiaries, and/or related entities).

50. Under information and belief, Defendants have violated Ohio statutory and common law by concealing the materials facts that: (i) AMR is an independent contractor, (ii)

AMR is not an "in-network" provider for Anthem insurance, (v) AMR engages in "balance

billing" practices, (vi) and AMR bills at rates substantially higher than any similar situated

physician would charge for the same services. Defendants concealed and refused to disclose any

information associated with AMR's services.

51.     Pursuant to Ohio R. Civ. P. 23(B)(3), Individual Plaintiff brings this action on

behalf of himself and the other similarly situated persons in a Class defined as:

> "All persons within the state of Ohio who within the four (4) years prior to the filing
> of this Class Action Complaint who received out-of-network medical transport
> services from AMR at hospitals and/or medical centers owned and operated by
> Premier Health Partners."

52.     Individual Plaintiff is a member of and seeks to represent the  Class.

53.     Defendants, and their employees, agents, and representatives are specifically

excluded from the Class.

54.     Individual Plaintiff reserves the right to modify the Class definition and the Class

period pursuant to discovery that is obtained during the course of this litigation.

**A.     Numerosity**

55.     Members of the Class are so numerous that their individual joinder is impractical.

It is believed there are hundreds of members of the proposed Class based on the size of Premier's

presence in the Dayton, Ohio area and the number of years AMR has been providing medical

transport services at Premier's facilities.

56.     The precise identities, numbers, and addresses of members of the Class are

unknown to Individual Plaintiff, but the identities of the members of each Class are known to

Defendants because they are parties to the transactions with the Class. It will thus be practical to

identify and provide notice to the members of the Class.

**B.     Common Questions of Fact and Law**

57.     There is a well-defined commonality and community of interest in the questions of fact and law involved affecting the members of the Class. The common questions of fact and law include, but are not limited to:

a.      Whether Defendants implemented methods, processes, practices, and procedures to represent to Class Members that they accepted health insurance and were in-network providers; the fact that AMR was an out-of-network service provider who did not accept Anthem and who engaged in the practice of "balance billing";

b.      Whether Defendants implemented methods, processes, practices and procedures to allow AMR to continue to engage in these unethical and illegal billing practices;

c.      Whether Defendants continued to conceal these practices from members of the Class, despite repeated complaints, grievances, and objections by consumers over the period of years;

d.      Whether the foregoing implemented methods, processes, practices and procedures constitute fraud, negligence, and unfair practices;

e.      Whether Defendants' misconduct was fraudulent, malicious, willful and wanton;

f.      Whether Defendants are liable for actual, treble, and punitive damages and the amount of such damages; and

g.      Whether Defendants should be enjoined from engaging in such misconduct in the future.

**C.     Typicality**

58.     The claims of Individual Plaintiffs are typical of the claims of the members of the Class.

**D.      Adequacy of Representation**

59.     Individual Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class, and he intends to prosecute this matter vigorously.

60.     Individual Plaintiff has retained competent counsel for this class action, and undersigned counsel intends to prosecute this action vigorously.

61.     Individual Plaintiff and his counsel will fairly and adequately protect the interest of the members of the Class.

**E.      Predominance**

62.     This suit may also be maintained as a class action because questions of fact and law common to the Class predominate over the questions affecting only the individual members of the Class. The claims asserted in this action are based upon substantially identical uniform methods, processes, practices, and procedures towards and representations made to each Member of each Class.

**F.      Superiority**

63.     A Class Action is superior to individual claims because the individual class members are individual consumers and the individual claims are for relatively small amounts relative to the cost of pursuing the claims individually, and the claims are thus not likely to be asserted or redressed in the absence of a Class Action.

64.     Class treatment is also superior because this action seeks substantial declaratory and injunctive relief. In the absence of the class treatment, to the extent that individual actions are pursued, there would be a significant risk of inconsistent judgments.

**FIRST CLAIM FOR RELIEF**
**OHIO CONSUMER SALES PRACTICES ACT**
**(Violation of Ohio Rev. Code § 1345.02 and § 1345.03,**
**and Ohio Admin. Code § 109:43-10)**
**(Individual Claims Against All Defendants)**

65.     Individual Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

66.     Individual Plaintiff seeks a declaratory judgment that Premier has violated the OCSPA, an injunction enjoining Premier's misrepresentations and omissions described in this Complaint, and damages based on Premier's violations of the OCSPA.

67.     The OCSPA prohibits unfair, deceptive or unconscionable consumer sales practices that mislead consumers about the nature of services they are receiving in connection with consumer transactions.

68.     Hospitals and medical service providers such as Premier and AMR are "suppliers" under Ohio Revised Code § 1345.01(C), and fall within the scope of the OCSPA. Monroe v. Forum Health, 11th Dist. No. 2012-T-0026, 2012-Ohio-6133, ¶63 ("Various courts have held that CSPA claims can be raised against hospitals or medical service providers, since they are not specifically exempted by the statute."); Summa Health Sys. v. Viningre, 140 Ohio App.3d 780, 795, 749 N.E.2d 344 (9th Dist. 2000) ("[A] transaction between a service provider such as a hospital and the consumer is not clearly exempted.").

69.     Individual Plaintiff engaged in "consumer transactions" as defined in Ohio Revised Code § 1345.01(A) with Defendants as detailed throughout this Complaint.

70.     The OCSPA specifically prohibits suppliers such as Premier and AMR from "commit[ting] unfair or deceptive practice[s]" or "unconscionable act[s] or practice[s] in connection with a consumer transaction." Ohio Rev. Code § 1345.02 and § 1345.03.

71.     Unfair and deceptive practices under the OCSPA include:

    a.      Making, or causing to be made, any written or oral claim that is false, misleading or deceptive;

    b.      Making any express or implied statement in connection with any product or service that is false, or has the capacity, tendency or effect of deceiving or misleading consumers;

    c.      Omitting any material information such that the express or implied statement deceives or tends to deceive consumers;

    d.      That the subject of a consumer transaction is available to the consumer for a reason that does not exist; or

    e.      That the supplier has a sponsorship, approval, or affiliation that the supplier does not have.

72.     In determining whether an act or practice is unconscionable, the following circumstances are considered:

    (a)      Whether the supplier has knowingly taken advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of an agreement;

    (b)      Whether the supplier knew at the time the consumer transaction was entered into that the price was substantially in excess of the price at which similar

property or services were readily obtainable in similar consumer transactions by

like consumers;

> (c)     Whether the supplier knew at the time the consumer transaction was

entered into of the inability of the consumer to receive a substantial benefit from

the subject of the consumer transaction;

> (d)     Whether the supplier knew at the time the consumer transaction was

entered into that there was no reasonable probability of payment of the obligation

in full by the consumer;

> (e)     Whether the supplier required the consumer to enter into a

consumer transaction on terms the supplier knew were substantially one-sided in

favor of the supplier; and

> (f)     Whether the supplier knowingly made a misleading statement of

opinion on which the consumer was likely to rely to the consumer's detriment.

73.     In addition, under Ohio Admin. Code § 109:4-3-10, the OCSPA makes it a

deceptive act or practice for a supplier in connection with a consumer transaction to "[m]ake any

representations, claims, or assertions of fact, whether orally or in writing, which would cause a

reasonable consumer to believe such statements are true, unless, at the time such representations,

claims or assertions are made, the supplier possesses or relies upon a reasonable basis in fact

such as factual, objective, quantifiable, clinical or scientific data or other competent or reliable

evidence which substantiates such representations, claims, or assertions of fact."

> (a)     Representing to Individual Plaintiffs that Premier accepted health

insurance and was an in-network provider;

(b)      Knowingly and intentionally concealing from Individual Plaintiff and the Class that (i) AMR is an independent contractor, (ii) AMR is not an "in-network" provider for Anthem, (v) AMR engages in "balance billing" practices, (vi) and AMR bills at rates substantially higher than what any similar situated company would charge for the same services, despite repeated complaints, grievances, and objections filed by consumers with Premier and AMR over the period of years;

(c)      Continuing to allow AMR to transport patients from its hospitals, to engage in unethical and illegal billing practices, and prey upon unsuspecting consumers, despite repeated complaints, grievances, and objections filed by consumers with Premier and AMR over the period of years; and

(d)      Continuing to conceal these foregoing facts and practices from Individual Plaintiff, despite repeated complaints, grievances, and objections filed by consumers with Premier and AMR over the period of years.

74.      Premier and AMR violated Ohio Revised Code § 1345.02 and § 1345.03, and Ohio Admin. Code § 109:4-3-10 as to Individual Plaintiff by, among other things: making untrue statements of material fact and/or omit to state material facts necessary in order to make the statements made not misleading relating to the provision of medical services, by engaging in unfair, deceptive, and unconscionable acts and practices in connection with consumer transactions. Defendants' unfair, deceptive, and unconscionable acts and practices have the capacity to deceive a substantial portion of the general public because these acts or practices were directed at Individual Plaintiff and other members of the general public via oral communications, standard form contracts, invoices, and letters. Moreover, Defendants' unfair,

deceptive, and unconscionable acts and practices have the capacity to deceive a substantial portion of the public as they have occurred repeatedly over a period of years with Individual Plaintiffs and many different members of the general public.

75.     These deceptive representations and concealments were reasonably calculated to deceive consumers, were made with the intent to deceive consumers, and did in fact deceive consumers.

76.     Upon information and belief, Defendants' representations and concealments constitute a course of conduct which continues to this day.

77.     Upon information and belief, but for these deceptive representations and concealments of material fact, Individual Plaintiff would not have incurred overpayments.

78.     Premier's complete and utter indifference of its obligations under Ohio law reveals a conscious disregard of the rights of Individual Plaintiff, and the injuries suffered by Individual Plaintiff are attended by circumstances of fraud, malice, and willful and wanton misconduct, calling for an assessment of punitive damages against Defendants, including damages (actual and statutory), punitive damages, treble damages, and attorney's fees and costs.

**SECOND CLAIM FOR RELIEF**
**OHIO CORRUPT PRACTICES ACT**
**(Violation of Ohio Rev. Code § 2923.31 et seq.)**
**(Individual and Class Claims Against Defendants)**

79.     The Individual Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

80.     Defendants communicated insurance and invoicing documents to Individual Plaintiffs and putative Class Members via wire (facsimile or e-mail), by United States mail, and/or orally.

81.     Premier and AMR each constitutes an "enterprise" as defined by Ohio Revised Code § 2923.31(C).

82.     Defendants also have defrauded Individual Plaintiff and Class Members by representing to Individual Plaintiff that Premier accepted health insurance and was an in-network provider; knowingly and intentionally concealing from Individual Plaintiffs that AMR was an out-of-network service provider who engaged in unlawful and fraudulent billing practices, such as "balance billing" of services; and allowing and/or continuing to engage in unethical and illegal billing practices and continuing to conceal these practices from Individual Plaintiffs, despite repeated complaints, grievances, and objections filed by consumers with Defendants over the period of years.

83.     Defendants knew the false and misleading nature of their statements, omissions, and conduct, and intended for Individual Plaintiff and Class Members to rely upon the promises and conduct to generate business revenues.

84.     Individual Plaintiff and Class Members did not know of the falsity of the statements, omissions, and conduct, and did not learn of the falsity and misconduct until they received bills from Defendants.

85.     Individual Plaintiffs and Class Members had the right to rely on and did rely on the false statements, omissions, and conduct of Defendants, and Individual Plaintiff and Class Members were damaged by their reliance.

86.     The Defendants' representations, omissions, and conduct constitute mail fraud and/or wire fraud, because the communications by Defendants were made via mail and/or wire.

87.     Defendants conducted and participated in the conduct of their billing scheme through a pattern of racketeering activity as defined in Ohio Revised Code § 2923.31(I)(2), which constitutes a Corrupt Activity under Ohio Revised Code § 2923.31(I)(1).

88.     Upon information and belief, Defendants have engaged in a pattern of racketeering activity because they have committed hundreds of acts of mail or wire fraud upon Individual Plaintiff and putative Class Members over a period of years, as a direct and proximate result of Defendants' violations of the OCPA, Individual Plaintiff and putative Class Members have suffered damages in an amount to be determined by the Court, including damages, punitive damages, treble damages, and attorney's fees and costs.

**THIRD CLAIM FOR RELIEF**
**COMMON LAW FRAUD**
**(Individual and Class Claims Against Defendants)**

89.     The Individual Plaintiff incorporate by reference the allegations contained in paragraphs 1 through 95 of the Complaint as if fully set forth herein.

90.     As part of their normal business practices, Defendants also made statements to Individual Plaintiffs and putative Class Members that Premier accepted health insurance as an in-network provider. Defendants failed to disclose the fact that AMR (i) was not an in-network provider, (ii) did not accept Individual Plaintiff's and Class' Plaintiffs' insurance, and (iii) engaged in the practice of "balance billing." Defendants had a duty to disclose this information because it was necessary to prevent Defendants' representations of accepting health insurance and being an in-network provider from being false.

91.     The Defendants knew the false and misleading nature of their conduct, statements, and omissions.

92.     Defendants made false representations and concealments of material facts to Individual Plaintiffs and putative Class Members for monetary gain. The false representations or concealments by Defendants were material and were made with the intent to mislead and defraud Individual Plaintiffs and putative Class Members.

93.     Defendants intended or expected Individual Plaintiffs and putative Class Members to rely upon the false representations or concealments and fraudulent conduct resulting in Individual Plaintiffs and putative Class Members receiving medical bills they otherwise would not have received from AMR.

94.     Individual Plaintiffs and putative Class Members had the right to rely on and did rely on the false statements and omissions of Defendants.

95.     Defendants knew the false and misleading nature of their conduct, statements, and omissions, as evidenced the numerous complaints and grievances filed by consumers over the period of years with Defendants regarding Defendants' billing practices and procedures.

96.     Defendants' complete and utter indifference of its obligations under Ohio law reveals a conscious disregard of the rights of Individual Plaintiff and putative Class Members, and the injuries suffered by Individual Plaintiff and putative Class Members are attended by circumstances of fraud, malice, and willful and wanton misconduct, calling for an assessment of punitive damages against Defendants.

97.     As a direct, proximate, and foreseeable result of Defendants' fraudulent conduct, Individual Plaintiff and putative Class Members suffered damages in an amount to be determined by the Court, including punitive damages, attorney's fees, and costs.

**FOURTH CLAIM FOR RELIEF**
**NEGLIGENT MISREPRESENTATION AND CONCEALMENT**
**(Individual and Class Claims Against Premier Health Partners Only)**

98.     The Individual Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

99.     Defendant Premier in the course of their business and profession supplied false material information to and/or concealed material information from Individual Plaintiff and putative Class Plaintiffs in their transactions with Defendants.

100.    Defendant Premier failed to exercise reasonable care or competence in supplying accurate information to Individual Plaintiff and putative Class Members.

101.    Individual Plaintiffs and putative Class Plaintiffs justifiably relied upon the false information and the concealment of the information.

102.    Due to Defendant Premier's failure to exercise reasonable care or competence in making material representations to Individual Plaintiff and putative Class Members, the representations and concealments were not only false, but also done with malice, and willful and wanton misconduct, calling for an assessment of punitive damages against Defendant Premier.

103.    As a direct, proximate, and foreseeable result of Defendant Premier's negligent misrepresentations and concealments, Individual Plaintiffs and putative Class Members suffered damages in an amount to be determined by the Court, including punitive damages, attorney's fees, and costs.

### FIFTH CLAIM FOR
### RELIEF
### CIVIL CONSPIRACY
**(Individual and Class Claims Against Defendants)**

104.    The Individual Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

105.     Defendants engaged in a malicious combination under which they purposefully committed unlawful torts independent from the civil conspiracy (See Second through Fourth Claims for Relief).

106.     Defendants conjured up this malicious scheme without reasonable or lawful excuse to purposefully and intentionally cause injury to Individual Plaintiffs and putative Class Members.

107.     As a direct, proximate, and foreseeable result of Defendants' malicious combination, Individual Plaintiff and putative Class Members suffered damages in an amount to be determined by the Court, including punitive damages, attorney's fees, and costs.

### SIXTH CLAIM FOR RELIEF
**(Breach of Contract – Intended Beneficiaries)**
**(Individual and Class Claims Against AMR)**

108.     The Individual Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

109.     Upon information and belief, Premier and AMR entered into a contract whereby AMR had a duty to (among other things) to perform medical transport services for Premier's patients and to disclose to patients its status as an independent contractor and its billing practices, including a duty to disclose whether it accepted insurance and whether it was an "in-network" provider. AMR also had a duty to charge patients reasonable rates to patients for performing its services and to work with patients to reasonably resolve billing issues.

110.     Upon information and belief, Premier and AMR entered into the contract with the intent to benefit Individual Plaintiffs and putative Class Plaintiffs by imposing these duties on AMR. Individual Plaintiff and putative Class Plaintiffs therefore were intended beneficiaries of this contract.

111.    AMR breached these duties by failing to disclose the following material facts: (i) it worked as an independent contractor, (ii) it does not accept Athem insurance, (iv) it is not an "in-network" provider for Anthem, (v) it engages in "balance billing" practices, (vi) and it bills at rates substantially higher than what any similar situated company would charge for the same services.

112.    Pursuant to Ohio R. Civ. P. 10(D)(1), the foregoing contract is not attached to the Complaint because it is in the possession of Premier and AMR as they maintain and control possession of the contract. Individual Plaintiff does not possess a copy of this contract at this time because (among other reasons) discovery has not taken place.

113.    As a direct, proximate, and foreseeable result of AMR's misconduct, Individual Plaintiff and putative Class Members have suffered damages in an amount to be determined by the Court.

**SEVENTH CLAIM FOR RELIEF**
**Breach of Implied Contract or Quasi-Contract**
**Individual and Class Claims Against AMR**

114.    Individual Plaintiff realleges each of the allegations set forth in the foregoing paragraphs of the Complaint.

115.    A contract is implied by law between the provider of emergency services and the Plaintiffs and other members of the Class, entitling the provider to the fair market or reasonable value of the emergency services rendered (the quantum meruit of the services performed).

116.    Defendant AMR, breached the terms of the implied contract by billing Individual Plaintiff and putative Class members at excessive rates much higher than the reasonable value implied by law.

117.    Defendant AMR was unjustly enriched through its breach of the implied contract, to the detriment of Plaintiff and other putative Class members.

118.    Defendant AMR should be compelled to provide restitution, and to disgorge into a common fund or constructive trust, for the benefit of Individual Plaintiff and the Class, all proceeds received from Individual Plaintiff and the Class as a result of any unlawful or inequitable act described herein that unjustly enriched them.

119.    Plaintiffs further seek an order enjoining Defendant from engaging in any unlawful or inequitable acts and practices as alleged herein, because of Defendants' continuing misrepresentations and improper billing practices.

120.    There is no adequate remedy at law.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Individual Plaintiff and putative Class Members ask this Court to enter judgment in their favor as follows:

A.  Certify the Class;

B.  Appoint Individual Plaintiff to be Class Representatives;

C.  Appoint undersigned counsel to be the Class Counsel;

D.  Award damages to Individual Plaintiff and each Class Member in an amount to be determined at trial;

E.  Award Individual Plaintiffs and each Class Member punitive or exemplary damages based on Defendants' willful and malicious conduct in an amount to be determined at trial;

F.  Award three times the damages sustained to Individual Plaintiff and each Class Member;

G. Order Defendants to disgorge, relinquish, and repay all fees, interest, and profits which Defendants procured by or through the use of unlawful and unethical conduct in an amount to be determined at trial;

H. Order that the acts alleged herein be declared unlawful in violation of Ohio statutory and common law;

I. Enjoin Defendants from engaging in further unlawful activity;

J. Award pre-judgment and post-judgment interest to Individual Plaintiff and each Class Member;

K. Award to Individual Plaintiff and each Class Member their attorney's fees, costs and expenses in an amount to be determined at trial;

L. Grant to Individual Plaintiff and each Class Member such further relief to which they are entitled and as this Court deems necessary.

Respectfully submitted,


/s/ Bryce A. Lenox
Bryce A. Lenox (0069936)
Trial Attorney
THE LAW OFFICE OF BRYCE A.
LENOX, ESQ. LLC
3825 Edwards Road, #103
Cincinnati, OH  45209
Direct: (513) 520-9829
E-Mail:
Bryce@BryceLenoxLaw.com

Attorney for Plaintiff

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury.

/s/ *Bryce A. Lenox*　　　　　　
Bryce A. Lenox
